UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

METROPOLITAN PROPERTY AND
CASUALTY INSURANCE COMPANY,

                        Plaintiff,

        -against-                                        1:15-CV-0780 (LEK/DJS)

GEORGE R. SARRIS, *et al.*,

                        Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Metropolitan Property and Casualty Insurance Company ("Met P&C")

commenced this action against defendants George and Joy Sarris, Theresa Schillaci, and Robert

Newell, seeking a declaration that it is not obligated to defend or indemnify the Sarrises in

connection with an ongoing lawsuit between the Sarrises and Schillaci and Newell. Dkt. No. 1

("Complaint"). The Sarrises likewise seek, among other things, a declaration that Met P&C has a

duty to defend and indemnify them in connection with the lawsuit. Dkt. No. 8 ("Joy Sarris

Answer") ¶¶ 129, 132; Dkt. No. 16 ("George Sarris Answer") ¶¶ 129, 134. Presently before the

Court are Met P&C's motion for summary judgment and judgment on the pleadings, Dkt. No. 65

("Met P&C Motion"); see also Dkt. No. 65-33 ("Met P&C Statement of Material Facts"); Dkt.

No. 65-34 ("Met P&C Memorandum"); Dkt. No. 82 ("Met P&C Responsive Statement of

Material Facts"); Dkt. No. 83 ("Met P&C Response"), Joy Sarris's cross-motion for summary

judgment, Dkt. No. 74 ("Joy Sarris Motion"); see also Dkt. No. 74-1 ("Joy Sarris Responsive

Statement of Material Facts"); Dkt. No. 74-2 ("Joy Sarris Statement of Material Facts"); Dkt. No.

77 ("Joy Sarris Memorandum"); Dkt. No. 90 ("Joy Sarris Reply"), and George Sarris's cross-

motion for summary judgment, Dkt. No. 78 ("George Sarris Motion"); Dkt. No. 91 ("George

Sarris Reply"). For the reasons that follow, Met P&C's Motion is granted in part and denied in

part, and George and Joy Sarris's Motions are granted in part and denied in part.

## II.    BACKGROUND

### A.  Factual Background

#### 1. The Policies

In December 1999, the Sarrises bought a piece of real property located at 11 Woodside

Drive in Clifton Park, New York. Met P&C SMF ¶ 1; Joy Sarris Responsive SMF ¶ 1.[1] Four

years later, Met P&C issued the Sarrises a homeowners insurance policy; the policy was renewed

a year later, and it covered the period from December 2004 to December 2005. Met P&C SMF

¶¶ 79–80; Joy Sarris Responsive SMF ¶¶ 79–80. The policy stated that Met P&C would "pay all

sums for bodily injury and property damage to others for which the law holds you responsible

because of an occurrence to which this coverage applies." Dkt. No. 65-23 ("Homeowners

Policy") at 28 (emphasis omitted). The policy defined "you" as "the person or persons named in

the Declarations[,] and if a resident of the same household[,] the spouse of such person or

persons," and it provided that "the responsibilities, acts and failures to act of a person defined as

you will be binding upon another person defined as you." Id. at 7–8 (emphasis omitted). It also

---

[1]  The parties' statements of material facts say that the property was located at 1
Woodside Drive, but that appears to be an error. In their answers, George and Joy Sarris state that
the property they purchased was located at 11 Woodside Drive, George Sarris Answer ¶ 15; Joy
Sarris Answer ¶ 15, and other documents filed with the pending motions confirm this, see, e.g.,
Dkt. No. 65-18 ("Joy Sarris Deposition") at 9:14–16 ("Q: And where do you reside? A: My
permanent address is at 11 Woodside Drive, Clifton Park, New York . . . .").

defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions during the term of the policy." Id. at 8. Several types of losses were excluded from coverage under the policy. For example, the policy did not cover "bodily injury or property damage which is reasonably expected or intended by [the policyholder] or which is the result of [the policyholder's] intentional and criminal acts or omissions." Id. at 28 (emphasis omitted).[2]

Under the policy, Met P&C was not required to provide coverage for an occurrence if the Sarrises failed to "[p]romptly notify [Met P&C] or [its] representative, in writing, stating: 1. [the policyholder's] name and policy number; 2. the date, place and circumstances of the accident; 3. the name and address of anyone who might have a claim against [the policyholder]; and 4. the names and addresses of any witnesses." Id. at 34. Coverage for an occurrence was also contingent on the Sarrises immediately sending Met P&C "any legal papers relating to the accident." Id. at 35.

The Sarrises purchased a personal excess liability policy ("PELP") from Met P&C as well. Met P&C SMF ¶¶ 91–92; Joy Sarris Responsive SMF ¶¶ 91–92. This policy "provide[d] liability coverage in excess of the 'retained limit' for damages to others caused by an 'occurrence' and to which the policy applies." Met P&C SMF ¶ 93; Joy Sarris Responsive SMF ¶ 93; see also Dkt. No. 65-25 ("PELP") at 6. Like the Homeowners Policy, the PELP defined "occurrence" as "an accident, including continuous or repeated exposure to the same condition that results during the policy period in personal injury or property damage," and it imposed "joint

_____

[2] In the remainder of this Memorandum-Decision and Order, the Court, in quoting from the Sarrises' policies, often replaces "you" with "policyholder" and "us" with "Met P&C."

obligations on all persons defined as you." PELP at 6, 10 (emphasis omitted). The PELP

excluded coverage for "personal injury or property damage" caused by "any intentional act

committed by an insured or at the direction of any insured." Id. at 7 (emphasis omitted). And the

PELP required the Sarrises to "notify [Met P&C] or any authorized agent as soon as practicable

of an occurrence that may be covered by th[e] policy." Id. at 8 (emphasis omitted).

           2.   *Schillaci v. Sarris*

       On April 28, 2005, Schillaci and Newell, neighbors of the Sarrises, commenced litigation

against the Sarrises in New York State Supreme Court, Saratoga County. Met P&C SMF ¶ 29;

Joy Sarris Responsive SMF ¶ 29. The complaint in this case alleged that Schillaci and Newell

had lived in their home on Woodside Drive for fourteen years. Dkt. No. 74-4 ("Schillaci

Complaint") ¶ 1. Before the Sarrises moved into an adjacent property in 1999, Schillaci and

Newell had "enjoyed the use and quiet enjoyment of their property." Id. ¶¶ 2, 6. Unfortunately,

that changed soon after the Sarrises arrived. The Sarrises' property contained a pond that George

relocated and expanded. Id. ¶¶ 8, 10–11. George's pond modifications, to which Schillaci and

Newell did not consent, id. ¶¶ 14–15, "altered the water flow and run-off such that" the pond was

"diverted onto Schillaci and Newell's property," id. ¶ 12. This in turn led to flooding in Schillaci

and Newell's basement. Id. ¶ 7.

       The Schillaci Complaint further alleged that George "began raising ducks and geese in

the family room of the [Sarrises'] dwelling." Id. ¶ 18. He also "began to entice both native and

domesticated ducks and geese onto his property by putting out feed for these fowl." Id. ¶ 19. As a

result of George's efforts, the number of waterfowl on the Sarrises' property "increased

exponentially," and this "escalat[ion]" in the "fowl population" "began to interfere increasingly

with Schillaci and Newell's quiet enjoyment of their property." Id. ¶¶ 20–21. Specifically, the large population of waterfowl on the Sarrises' property "increased the noise which began at dawn or before . . . to the point [that] it disturbed both Schillaci and Newell's sleep and the use of their property." Id. ¶ 22. Another unfortunate consequence of George's "intentional actions" in raising waterfowl on his property was an "increase[ in] the amount of guano from the birds which was naturally deposited on [Schillaci and Newell's] house, lawn, cars and other possessions." Id. ¶¶ 23, 25. Eventually, "the noxious odor and manure" coming from the waterfowl prevented Schillaci and Newell from "us[ing] the exterior of their home or their yard during the warmer weather." Id. ¶ 26.

According to the Schillaci Complaint, Schillaci and Newell tried to work things out with George, but he "did nothing to abate the continuing nuisance." Id. ¶¶ 28–29. The Schillaci Complaint detailed George's efforts to seek a variance from the Clifton Park zoning code so that he could raise waterfowl on the residential portion of his property. Id. ¶ 32. In August 2003, George applied for the variance, id., and a public hearing was held on the application around September 2, 2003, id. ¶ 33. Schillaci and Newell spoke at the hearing and "presented the Zoning Board of Appeals with a Petition signed by over fifty of Sarris'[s] neighbors opposing the . . . [a]pplication for a variance." Id. The next month, the Zoning Board of Appeals denied George's application for a variance and gave him "sixty . . . days . . . to remove the domestic ducks and geese." Id. ¶ 34. The Schillaci Complaint went on to describe George's refusal to obey this order, noting that he was fined in 2004 for his noncompliance. Id. ¶¶ 35–37. According to Schillaci and Newell, George's defiance showed that he "fully intend[ed] to continue to maintain

his private nuisance and thereby interfere with Schillaci and Newell's right to the quiet enjoyment of their property." Id. ¶ 43.

The Schillaci Complaint contained three causes of action: private nuisance resulting from the "rais[ing] and feed[ing] of both domestic and wild fowl on [the Sarrises'] property," trespass caused by the noise and guano coming from the waterfowl, and trespass "in the form of water appearing in [Schillaci and Newell's] basement for the first time in . . . fifteen years." Id. ¶¶ 44–54. Schillaci and Newell requested an injunction ordering the Sarrises to "cease operating a feeding station and raising both domestic and wild ducks and geese," $250,000 in damages, and attorney's fees. Id. at 8.[3]

Though it began over a decade ago, the Schillaci litigation appears to be ongoing. See Dkt. No. 75 ("George Sarris Declaration") ¶ 86 ("Of utmost importance to me as a defendant is that the underlying Schillaci matter is still ongoing and unadjudicated."). The parties have engaged in extensive pretrial motion practice. The details are irrelevant to the pending motions, but in March 2009, Justice Stephen A. Ferradino denied the parties' motions for summary judgment, see Dkt. No. 65-12 ("May 2009 Hearing Transcript") at 1:1–4 ("This case has been sitting for an awfully long time, and I recently in March issued a decision denying both parties['] motions for summary judgment."), and in October 2012, Justice Thomas D. Nolan, Jr. (to whom the case had been reassigned) dismissed the trespass claim relating to the flooding of the

---

[3] The Sarrises devote a significant portion of their motion papers to rebutting the version of events offered in the Schillaci Complaint. E.g., Joy Sarris SMF ¶¶ 19–37. Since the Court need not go beyond the four corners of the Schillaci Complaint in order to find that it triggered Met P&C's duty to defend the Sarrises, there is no need to give the Sarrises' side of the story. And while Met P&C and the Sarrises recount in great detail the history of the litigation between George Sarris and Clifton Park, e.g., id. ¶¶ 38–58; Met P&C SMF ¶¶ 20–28, this story also has no bearing on the Court's resolution of the parties' motions.

basement, Dkt. No. 65-14 ("October 2012 Decision") at 11–12. But Justice Nolan declined to

grant summary judgment on Schillaci and Newell's other causes of action, id. at 14, and the

Appellate Division affirmed that ruling in November 2014, Schillaci v. Sarris, 997 N.Y.S.2d 504,

509 (App. Div. 2014).

###### 3. The Sarrises' Interactions with Met P&C

George Sarris received service of the Schillaci lawsuit on May 11, 2005. George Sarris

Decl. ¶ 57. He says that "within days of May 11, 2005," he informed "MetLife Agent Vincent

DeMidio of the underlying Schillaci lawsuit." Id. ¶ 58. George and DeMidio allegedly met for

over an hour, and George gave him "a copy of the underlying suit, which . . . DeMidio copied[]

and returned to me." Id. ¶ 59. DeMidio told him that "MetLife would provide defense and

coverage on the Schillaci suit," id. ¶ 60, and he left DeMidio's office thinking that he had

fulfilled his obligation to provide notice of the lawsuit to his insurer, Dkt. No. 65-16 ("George

Sarris Deposition") at 60:11–15. DeMidio, for his part, testified that he could not recall George

Sarris providing him a copy of the complaint and summons in the Schillaci case. Dkt. No. 65-19

("DeMidio Deposition") at 35:4–11. DeMidio did recall George visiting him in his office on

several occasions, id. at 35:12–15, and he remembered George mentioning "some problem with

the town," id. at 36:1, but he insisted that he had no recollection of George talking about his

neighbors suing him over the waterfowl on his property, id. at 45:8–11. George says that, per

DeMidio's instructions, he "routinely notified DeMidio of the progress of the underlying lawsuit

over the next six years, . . . [and] would provide DeMidio with the latest papers in

the . . . lawsuit." George Sarris Decl. ¶ 120.

DeMidio explained at his deposition that his practice was to tell customers who wanted to file a claim that they "ha[d] to call claims to make [a] claim, because I only represent the company. I don't represent claims." DeMidio Dep. at 76:19–77:3. DeMidio also said that he would typically tell such a customer that if she did not file her claim through "the claims reporting procedure," Met P&C could deny coverage for lack of timely notice. Id. at 77:5–13. According to DeMidio, he "always left [customers attempting to make claims] a card with [a] customer service number" so that they could call Met P&C and report their claims, and he never reported claims on behalf of customers. Id. at 78:9–20. Again, DeMidio testified that he could not recall telling George or Joy Sarris that he would report the claim on their behalf. Id. at 78:21–79:6.

After DeMidio retired in 2011, id. at 6:22–7:1, George claims he met with MetLife agent Kevin Eberz to discuss the Schillaci lawsuit, George Sarris Dep. at 74:3–14. George apparently "needed the big guns of Met-Life" because he "couldn't reason with the judges" and "it was a very complex case and not everybody understands or appreciates the subtleties of the law." Id. at 75:2–3, 75:11–13.[4] According to George, Eberz "didn't know who to contact, but he was going to have them call me, somebody from legal call me." Id. at 75:14–16. A month went by and George had yet to receive a call from legal, so he went back to the MetLife office. Id. at 75:17–18. But Eberz was not there, and George had to speak to someone else at the office, who took a copy of recent papers related to the Schillaci case and told George that "legal [would]

---

[4]  Until August 2005, George was represented by David Pentowski in the Schillaci case. George Sarris Dep. at 79:8–12, 80:3–7. From September 2005 to 2008, George and his wife were represented by Peter Henner. Id. at 80:9–12, 82:21–25. George has proceeded pro se in the Schillaci case since then, id. at 83:6–13, and he proceeds pro se in this action as well.

contact [him]." Id. at 75:18–76:4. Again, nobody from legal contacted him, and in November 2012, he wrote a letter to Eberz "memorializing the prior contact [he] had with [Eberz]." Id. at 77:2–5, 78:4–12. Eberz testified that he could not remember talking with George about the Schillaci case or receiving the letter. Dkt. No. 65-20 ("Eberz Deposition") at 13:18–23, 14:16–20, 16:11–21.

Met P&C claims that it did not receive notice of the Schillaci case until December 23, 2014, when George Sarris called the "MetLife 1-800 claim reporting number." Dkt. No. 65-21 ("Burnep Affidavit") ¶¶ 9–10. And Met P&C allegedly did not receive the complaint and summons in the Schillaci case until December 29, 2014, when Joy Sarris sent the two documents in an email. Id. ¶ 11. On January 1, 2015, George sent Met P&C a "thumb-drive containing a 3,000+ page Record on Appeal evidencing the protracted, and at that time ten-year, litigation history in the *Schillaci* Action." Id. ¶ 12. On January 23, 2015, Cynthia J. Burnep, a senior claim adjuster at Met P&C, wrote a letter to the Sarrises informing them that Met P&C would not provide coverage for the Schillaci case because it was "not given timely notice of this loss as required by both the Policy and PELP." Dkt. No. 65-28 ("January 23, 2015 Letter") at 1. One month later, Burnep sent another letter to the Sarrises, this time to let them know that it would not provide coverage because, in addition to the lack of timely notice, "the alleged 'property damage,' if any, was not caused by any 'occurrence' as that term is defined," and the intentional act exclusion barred coverage. Dkt. No. 65-29 ("February 2015 Letter") at 7.[5]

---

[5]  The Sarrises take pains to establish that Burnep's investigation was a "sham," Joy Sarris Mem. at 24; see also, e.g., Joy Sarris SMF ¶¶ 130–36, but the adequacy of Met P&C's investigative efforts in 2015 is not relevant to the pending motions.

Met P&C attempts to bolster its version of events by providing an affidavit from MetLife associate general counsel Charles Cavas. Dkt. No. 65-32 ("Cavas Affidavit"). Cavas notes that MetLife's legal department uses a management system named "Law Manager," in which a file is created if legal "receives any requests for legal advice, inquiries into any substantial issues, or notices of significant litigation." Id. ¶¶ 6–7. In February 2015, the legal department searched Law Manager "using the name 'Sarris,' the claim number, and the policy number," and was unable to "find any file or record evidencing any inquiries made by George or Joy Sarris or any prior communication had as between the MetLife Legal Department and George or Joy Sarris." Id. ¶¶ 9–10.

### B.  Procedural History

Met P&C filed its Complaint in this action on June 25, 2015. Compl. It seeks a declaratory judgment that it has no obligation to defend or indemnify the Sarrises in connection with the Schillaci case. Id. at 14. In their answers, the Sarrises brought counterclaims against Met P&C seeking a declaration that Met P&C in fact has a duty to defend and indemnify them in the Schillaci action. Joy Sarris Answer ¶¶ 129, 132; George Sarris Answer ¶¶ 129, 134. Joy Sarris also brought counterclaims against Met P&C for violations of New York General Business Law section 349, New York Insurance Law section 2601, and New York insurance regulations. Joy Sarris Answer ¶¶ 135–143. George Sarris brought counterclaims for breach of the implied duty of good faith and fair dealing and violations of New York Insurance Law section 2601 and New York insurance regulations. George Sarris Answer ¶¶ 126–40.

On February 6, 2017, Met P&C moved for summary judgment and for judgment on the pleadings. Met P&C Mot. Met P&C argues that the Schillaci action did not trigger its duty to

10

defend or indemnify the Sarrises under the Homeowners Policy or the PELP. Met P&C Mem.

at 4–10, 13. It also argues that the intentional loss exclusion in the Homeowners Policy and the

intentional act exclusion in the PELP preclude coverage for the Schillaci action. Id. at 10–13.

Met P&C next claims that coverage was defeated by the Sarrises' failure to provide timely notice

of the Schillaci action. Id. at 14–18. Finally, Met P&C moves for judgment on the pleadings,

seeking dismissal of the Sarrises' counterclaims alleging violations of New York state law. Id.

at 22–25.

      Joy and George Sarris separately cross-moved for summary judgment on May 15, 2017.

Joy Sarris Mot.; George Sarris Mot. Nonetheless, the Sarrises' briefs in support of their cross-

motions are substantively identical. Compare Joy Sarris Mem., with Dkt. No. 78-3 ("George

Sarris Memorandum"). The Sarrises argue that the Homeowners Policy and the PELP provide

coverage for the Schillaci action, and that Met P&C in fact received timely notice of the lawsuit.

Joy Sarris Mem. at 2–23. They also argue that Met P&C's request for a declaration that it has no

duty to indemnify is "not ripe for summary judgment." Id. at 1. Tacked onto the end of the

Sarrises' briefs are requests that the Court, among other things, "[f]ind that plaintiffs' complaint

is barred by the statute of limitations" and "find that Melife [sic] breached their [sic] implied

duty of good faith and fair dealing." Id. at 23–24. The Sarrises do not attempt to support these

requests with arguments or citations to relevant authority.

## III.    LEGAL STANDARD

### A.  Motion for Summary Judgment

      Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary

judgment if "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[f]actual disputes that are

irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie

if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924

F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the

nonmoving party should summary judgment be granted.").

    The party seeking summary judgment bears the burden of informing the court of the basis

for the motion and of identifying those portions of the record that the moving party claims will

demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party

carries the ultimate burden of proof and has failed "to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." Id.

at 322.

    In attempting to repel a motion for summary judgment after the moving party has met its

initial burden, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all

reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736,

742 (2d Cir. 1998). Thus, a court's duty in reviewing a motion for summary judgment is

"carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v.

Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

12

**B.  Motion for Judgment on the Pleadings**

A party may move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) any time after the close of pleadings but before trial. E.g., Calingo v. Meridian Res. Co., No. 11-CV-628, 2013 WL 1250448, at *2 (S.D.N.Y. Feb. 20, 2013). Rule 12(c) motions for judgment on the pleadings are decided by the same standard as Rule 12(b)(6) motions to dismiss for failure to state a claim. Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010). Thus, to survive a Rule 12(c) motion, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a pleading and draw all inferences in favor of the non-moving party. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-[plaintiff]-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id. at 678–79.

13

IV.    **DISCUSSION**

    **A.  Duty to Defend**

"In New York, an insurer's duty to defend is 'exceedingly broad' and distinct from the duty to indemnify." Euchner-USA, Inc. v. Hartford Cas. Ins. Co., 754 F.3d 136, 140 (2d Cir. 2014) (quoting Auto. Ins. Co. of Hartford v. Cook, 850 N.E.2d 1152, 1155 (N.Y. 2006)).[6] "The insured party bears the burden of establishing that the claimed loss falls within the scope of the policy." Mount Vernon Fire Ins. Co. v. Munoz Trucking Corp., 213 F. Supp. 3d 594, 601 (S.D.N.Y. 2016). "The duty of an insurer to defend its insured arises whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim, or where the insurer 'has actual knowledge of facts establishing a reasonable possibility of coverage.'" Frontier Insulation Contractors, Inc. v. Merchs. Mut. Ins. Co., 690 N.E.2d 866, 868 (N.Y. 1997) (quoting Fitzpatrick v. Am. Honda Motor Co., 575 N.E.2d 90, 93 (N.Y. 1991)). Accordingly, "[t]he insurer's duty to defend the entire action is triggered even if only one claim is potentially covered by the insurance policy." Mass. Bay Ins. Co. v. Penny Preville, Inc., No. 95-CV-4845, 1996 WL 389266, at *4 (S.D.N.Y. July 10, 1996). In evaluating the underlying complaint, a court must look to its "factual allegations . . ., and not its legal characterizations of the underlying events." Dodge v. Legion Ins. Co., 102 F. Supp. 2d 144, 150 (S.D.N.Y. 2000). "Any doubt as to whether the allegations state a claim within the coverage of the policy must be resolved in favor of the insured and against the carrier." JD2 Envtl., Inc. v. Endurance Am. Ins.

---

[6]  Since the parties' briefs assume that New York law applies, the Court need not engage in a choice-of-law analysis. See Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 514 n.4 (2d Cir. 2001) ("The parties' briefs assume that New York substantive law governs the issues of contract interpretation and statute of limitations presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law.").

Co., No. 14-CV-8888, 2017 WL 751157, at *3 (S.D.N.Y. Feb. 27, 2017) (quoting Euchner-USA,

Inc., 754 F.3d at 141). Moreover, "[t]he duty [to defend] remains 'even though facts outside the

four corners of [the] pleadings indicate that the claim may be meritless or not covered.'"

Cumberland Farms, Inc. v. Tower Grp., Inc., 28 N.Y.S.3d 119, 122 (App. Div. 2016) (third

alteration in original) (quoting Fitzpatrick, 575 N.E.2d at 90); see also Cont'l Cas. Co. v. JBS

Constr. Mgmt., Inc., No. 09-CV-6697, 2010 WL 2834898, at *3 (S.D.N.Y. July 1, 2010) ("[I]n

purchasing a policy containing a duty to defend, the insured is contracting for the insurer to bear

the costs of defending lawsuits—including 'groundless' lawsuits—as long as the allegations in

those lawsuits, however unfounded, would, if proven true, give rise to a duty to indemnify.").

　　　　An insurer may use a policy exclusion to avoid its duty to defend by "demonstrat[ing] that

the allegations of [the] underlying complaint place that pleading solely and entirely within the

exclusions of the policy and that the allegations are subject to no other interpretation." Gen. Star

Indem. Co. v. Driven Sports, Inc., 80 F. Supp. 3d 442, 450 (E.D.N.Y. 2015) (quoting CGS

Indus., Inc. v. Charter Oak Fire Ins. Co., 720 F.3d 71, 77 (2d Cir. 2013)). In other words, "[w]hen

an exclusion clause is relied upon to deny coverage, 'the burden rests upon the insurance

company to demonstrate that the allegations of the complaint can be interpreted only to exclude

coverage.'" Village of Piermont v. Am. Alt. Ins. Corp., 151 F. Supp. 3d 438, 448 (S.D.N.Y.

2015) (quoting Town of Massena v. Healthcare Underwriters Mut. Ins. Co., 779 N.E.2d 167, 170

(N.Y. 2002)). Moreover, an insurer cannot rely on a policy exclusion to disclaim coverage unless

it "establish[es] that the exclusion is stated in clear and unmistakable language, is subject to no

other reasonable interpretation, and applies in the particular case and that its interpretation of the

exclusion is the only construction that could fairly be placed thereon." James River Ins. Co. v.

15

Power Mgmt., Inc., 55 F. Supp. 3d 446, 453 (E.D.N.Y. 2014) (quoting Parks Real Estate

Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006)).

### 1. Was There an Occurrence?

Met P&C argues that the Schillaci Complaint did not trigger its duty to defend the

Sarrises because that pleading failed to allege an "occurrence" as required by the Homeowners

Policy. Met P&C Mem. at 8. Met P&C also suggests that "documentary evidence" it has

provided to the Court shows that its duty to defend was not triggered. Id. According to Met P&C,

these two sources "establish[] that the injuries alleged [in the Schillaci action] were caused by the

intentional and purposeful acts of the Sarrises," thereby defeating coverage. Id. at 9. The Sarrises,

for their part, argue that the Schillaci Complaint triggered Met P&C's duty to defend because

they "did not intend to cause the articulated damages of guano [and] excessive noise." Joy Sarris

Mem. at 15. Under the Sarrises' policy, Met P&C agreed to provide coverage for "property

damage to others for which the law holds [the policyholder] responsible because of an occurrence

to which this coverage applies." Homeowners Policy at 28 (emphasis omitted).[7] The policy

defined "occurrence" as "an accident, including continuous or repeated exposure to substantially

the same general harmful conditions during the term of the policy." Id. at 8. While the policy did

not define "accident," that term has a well-settled meaning in New York insurance law.

"The term 'accident' is broadly defined in our jurisprudence, utilizing an average person

standard." Agoado Realty Corp. v. United Int'l Ins. Co., 733 N.E.2d 213, 215 (N.Y. 2000). "In

---

[7] Met P&C does not appear to dispute that the interference with Schillaci and Newell's use and enjoyment of their property alleged in the Schillaci Complaint qualifies as "property damage" under the policies. And for good reason: the policies defined "property damage" to include "loss of use" of the property in question, Homeowners Policy at 8; PELP at 11, which certainly encompasses the injuries described in the Schillaci Complaint.

deciding whether a loss is the result of an accident, it must be determined, from the point of view of the insured, whether the loss was unexpected, unusual and unforeseen." Allegany Co-op Ins. Co. v. Kohorst, 678 N.Y.S.2d 424, 425 (App. Div. 1998). "It is well settled that an injury may be accidental even though it results from an intentional act." Dodge, 102 F. Supp. 2d at 151 (collecting cases). This reflects the principle that "[i]nsurance policies must . . . be read 'narrowly, barring recovery only when the insured intended the damages.'" Gen. Accident Ins. Co. v. Zazynski, 645 N.Y.S.2d 220, 220 (App. Div. 1996) (quoting Cont'l Cas. Co. v. Rapid-American Corp., 609 N.E.2d 506, 510 (N.Y. 1993)). Thus, "damages arising from an intended act may . . . be deemed accidental, so long as they arise out of 'a chain of unintended . . . [subsequent] events.'" Commercial Union Assurance Co. v. Oak Park Marina, Inc., 198 F.3d 55, 59 (2d Cir. 1999) (second and third alterations in original) (quoting City of Johnston v. Bankers Standard Ins. Co., 877 F.2d 1146, 1150 (2d Cir. 1989)). Put differently, "[a]ccidental results can flow from intentional acts. The damage in question may be unintended even though the original act or acts leading to the damage were intentional." Salimbene v. Merchants Mut. Ins. Co., 629 N.Y.S.2d 913, 915–16 (App. Div. 1995); see also Brooklyn Law Sch. v. Aetna Cas. & Sur. Co., 849 F.2d 788, 789 (2d Cir. 1988) ("New York courts interpreting the meaning of an 'occurrence,' . . . have determined that liability coverage depends upon whether the alleged injury was intentionally caused or was an unintended, although foreseeable, result of the alleged intentional conduct.").

Nevertheless, when the conduct alleged in the underlying complaint "is such that . . . harm to the victim is inherent in the nature of the acts alleged, . . . courts have had little difficulty in finding that the resulting harm was expected or intended by the insured." Jubin v. St.

Paul Fire & Marine Ins. Co., 653 N.Y.S.2d 454, 455 (App. Div. 1997) (collecting cases). Harm is

"'inherent in the nature' of an act when the act is so exceptional that 'cause and effect cannot be

separated; that to do the act is necessarily to do the harm which is its consequence; and that since

unquestionably the act is intended, so also is the harm.'" Progressive N. Ins. Co. v. Rafferty, 793

N.Y.S.2d 618, 619–20 (App. Div. 2005) (quoting Allstate Ins. Co. v. Mugavero, 589 N.E.2d 365,

369 (N.Y. 1992)). For example, in Pennsylvania Millers Mutual Insurance Co. v. Rigo, 681

N.Y.S.2d 414, 415 (App. Div. 1998), the insured, believing his victim had made "an obscene

gesture at him," "approached him without warning and struck him in the jaw with a closed fist."

Although the insured argued that he did not intend to injure his victim, the court found that the

insurer had no duty to defend because "it [wa]s clear that [the victim's] injuries flowed directly

from [the insured's] purposeful act." Id. at 416. "The general rule remains[, however,] that 'more

than a causal connection between the intentional act and the resultant harm is required to prove

that the harm was intended.'" Slayko v. Sec. Mut. Ins. Co., 774 N.E.2d 208, 210 (N.Y. 2002)

(quoting Mugavero, 589 N.E.2d at 369).

　　　　Here, the Schillaci Complaint alleged that George Sarris's decision to raise waterfowl on

his property harmed Schillaci and Newell by "increas[ing] the noise which began at dawn or

before" and "increas[ing] the amount of guano . . . which was . . . deposited on the Plaintiffs'

[property]." Schillaci Compl. ¶¶ 22–23. The complaint suggested that "the massive increase in

fowl population [was] caused by Sarris'[s] intentional actions." Id. ¶ 25. And it emphasized that

even though Schillaci and Newell had informed George of the problems allegedly caused by the

waterfowl, he "did nothing to abate the continuing nuisance." Id. ¶¶ 24–25. But the Schillaci

Complaint failed to provide any factual allegations suggesting that the Sarrises intended to injure

18

Schillaci and Newell by "carpet[ing] their lawn, property and possessions [with guano]" and

subjecting them to the "acrimonious din [of the waterfowl]." Id. ¶¶ 26–27. True, the complaint

suggested that George acted intentionally in raising the waterfowl, but it is well established that

"[t]he damage in question may be unintended even though the original act or acts leading to the

damage were intentional." Salimbene, 629 N.Y.S.2d at 915–16. And a fair reading of the

complaint is that the injuries to Schillaci and Newell "ar[ose] out of a chain of unintended though

expected or foreseeable events that occurred after an intentional act." Brooklyn Law Sch., 849

F.2d at 789 (quoting Cont'l Ins. Co. v. Colangione, 484 N.Y.S.2d 929, 930 (App. Div. 1985)).

That is enough to establish that the Schillaci Complaint triggered Met P&C's duty to defend. See

Fitzpatrick, 575 N.E.2d at 92 ("[A]n insurer's duty to defend is at least broad enough to apply

when the "four corners of the complaint" suggest the *reasonable possibility* of coverage."

(emphasis added)).[8]

Met P&C cannot defeat coverage by claiming that the conduct described in the Schillaci

Complaint "is such that . . . harm to the victim is inherent in the nature of the acts alleged."

Jubin, 653 N.Y.S.2d at 455. This exception applies only to "a narrow class of cases," Slayko, 774

N.E.2d at 210, and the causal connection between George's conduct and the harm suffered by

Schillaci and Newell is not strong enough to trigger it. Consider, for example, Barry v.

---

[8]  As Met P&C points out, Met P&C Mem. at 7, in County of Broome v. Aetna Casusalty
& Surety Co., 540 N.Y.S.2d 620, 622 (App. Div. 1989), the court suggested that coverage may
be denied if "if the actor knew or should have known there was a substantial probability that a
certain result would take place." Yet as the Second Circuit correctly noted, if County of Broome
is read to stand for the proposition that conduct is not accidental when it leads to "damage that
[i]s, objectively speaking, substantially probable, that interpretation appears to conflict with
[established New York precedent]." City of Johnstown, 877 F.2d at 1151 n.1; see also
Harleysville Worcester Ins. Co. v. Paramount Concrete, 123 F. Supp. 3d 282, 298 n.24 (D. Conn.
2015) ("Although County of Broome is a New York case, it applies New York law incorrectly.").

Romanosky, 538 N.Y.S.2d 14, 15 (App. Div. 1989), in which the insured was ejected from a club

after "an altercation with several bouncers." The insured returned to the club with a twelve-gauge

shotgun and "fired a round of buckshot at the front door of the club, injuring the [victim] who

was inside." Id. The insured testified that "he only intended to damage the door of the

discotheque and that he did not think that anyone would be injured." Id. The court found that

because the insured "did not intend or expect to cause the injury," the insurer was obligated to

provide coverage for the incident. Id. at 16. Similarly, in Kohorst, 678 N.Y.S.2d at 425, the

insured set fire to a property he owned in order to collect the insurance proceeds. Someone

"sustained burn injuries" as a result of the fire, and the insurer attempted to argue that coverage

was not triggered because the injuries did not stem from an accident. Id. The court rejected that

argument on the ground that "physical and/or emotional harm to another person is not the

inherent result of an arson committed for insurance purposes, but may be the unexpected or

unintended result of an intentional act." Id. The causal connection between conduct and injury in

these cases was at least as strong as that alleged in the Schillaci Complaint. Thus, the Court

cannot say that because George intended to raise waterfowl on his property, he necessarily

intended to harm Schillaci and Newell.

Alternatively, one might infer an intent to harm from the warnings Schillaci and Newell

gave the Sarrises about the problems allegedly caused by the waterfowl. According to the

Schillaci Complaint, George learned that his neighbors believed the waterfowl were making their

lives miserable, yet he refused to do anything about it. Schillaci Compl. ¶¶ 28–29. The trouble is

that courts have rejected the notion that an intent to cause injury can be gleaned from an

insured's decision to persist in potentially harmful conduct in the face of warnings about its

20

negative consequences. For instance, in City of Johnstown, 877 F.2d at 1147, the underlying

complaint alleged that the city allowed "sewage sludge" to be dumped in a landfill it owned.

After "evidence . . . emerged that . . . certain wastes leaking from the dump may have polluted

the surrounding groundwaters," New York state sued the city. Id. The city's insurer attempted to

disclaim coverage on the ground that the city had received several warnings over the years that

"the landfill apparently was contaminating the local groundwaters." Id. at 1152. The Second

Circuit disagreed and held that "proof of warnings of possible physical damages is not enough to

show that as a matter of law the damages ultimately incurred were expected or intended." Id.

More specifically, while "the City was aware of potential contamination, . . . [there was no

indication] . . . that the City intended the resulting damage, nor that the City, intending harm,

knew that the extensive damages alleged in the . . . complaint would flow directly and

immediately from the City's intentional acts." Id.

       Here, Schillaci and Newell undoubtedly made the Sarrises aware of the potential for harm

resulting from the waterfowl on their property. The Sarrises thus "took a calculated risk" in

continuing to raise the ducks and geese despite their neighbors' complaints, but such a decision

does not establish an intent to cause the resulting harm. Id.; see also 670 Apartments Corp. v.

Agric. Ins. Co., No. 96-CV-1464, 1996 WL 559942, at *1, 5 (S.D.N.Y. Oct. 2, 1996) (finding a

covered occurrence where the underlying complaint alleged that the insured, after installing a

boiler underneath the victims' apartment, received several complaints from the victims about

"excessive noise and vibration" from the boiler, did not remove the boiler, and was later sued by

the victims); McGroaty v. Great Am. Ins. Co., 329 N.E.2d 172, 173–75 (N.Y. 1975) (finding that

an insurer's duty to defend was triggered by a complaint alleging that the insured, despite

receiving warnings from the victim that the insured's construction "methods threatened [the victim's garage wall]," continued its construction and caused the damage warned of by the victim). Accordingly, the warnings received by the Sarrises cannot defeat Met P&C's duty to defend.

Met P&C appears to argue that this case is on all fours with Central Mutual Insurance Co. v. Willig, 29 F. Supp. 3d 112 (N.D.N.Y. 2014). Met P&C Mem. at 5–8. The Court disagrees. In Willig, the underlying complaint described an "unrelenting battle" between the insured and the victim over an easement owned by the victim. 29 F. Supp. 3d at 115. The insured allegedly "undertook several actions to impede [the victim's] use of his easement." Id. For example, the insured destroyed the victim's dock, prevented the victim from accessing the dock area, "alter[ed] the grade, pitch, and size of the northerly easement so that the [victim's] easement was rendered unusable," and "block[ed] the easement and dock with boards containing nails protruding upward and his vehicle." Id. The victim eventually brought a tort suit against the insured. Id. at 116. The court in Willig had to decide whether the conduct just described constituted an accident triggering the insurer's duty to defend. Id. at 119. After noting that "certain intentional acts, *which actually cause their intended consequences*, are not considered 'accidents,'" the court held that the underlying complaint did not trigger the duty to defend because it failed to allege an accident as required by the policy. Id. (emphasis added). That conclusion rested on the fact that the underlying complaint described "a continuous course of conduct that was designed to remove [the victim] from [the insured's] property, even at the cost of bodily injury or property damage." Id. at 120.

The allegations in the Schillaci Complaint, by contrast, do not suggest that the Sarrises intended to harm Schillaci and Newell. Unlike the complaint in <u>Willig</u>, which alleged a scheme designed to injure the victim, the Schillaci Complaint alleged at most indifference to Schillaci and Newell's well-being. That may suggest an unfortunate lack of manners, but New York law is clear that an injury that is "an unintended, although foreseeable, result of . . . alleged[ly] intentional conduct" does not foreclose coverage. <u>Brooklyn Law Sch.</u>, 849 F.2d at 789. Accordingly, the Court holds that the Schillaci Complaint triggered Met P&C's duty to defend the Sarrises because it alleged an occurrence as required by the Homeowners Policy.[9]

### 2. The Intentional Loss Exclusion and the PELP

Met P&C argues that even if its duty to defend was triggered by the Schillaci Complaint, the intentional loss exclusion bars coverage. Met P&C Mem. at 10–12. Under this exclusion, Met P&C is not responsible for "bodily injury or property damage which is reasonably expected or intended by [the policyholder] or which is the result of [the policyholder's] intentional and criminal acts or omissions." Homeowners Policy at 28. According to Met P&C, the intentional loss exclusion "bar[s] coverage not only for injury that was intended by the insured, but also

---

[9]   As noted above, Met P&C suggests that the Court may look beyond the four corners of the Schillaci Complaint in determining whether that pleading triggered its duty to defend. Met P&C Mem. at 8. Not so. Under New York law, "the insurer cannot rely on facts outside of the four corners of the complaint to negate the duty to defend." <u>Greenberg v. Nat'l Chiropractic Mut. Ins. Co.</u>, No. 96-CV-52, 1996 WL 374145, at *2 (S.D.N.Y. July 3, 1996); <u>see also</u> <u>JBS Constr. Mgmt., Inc.</u>, 2010 WL 2834898, at *3 (surveying New York law and concluding that insurers may not use "extrinsic fact[s]" outside the four corners of the complaint to "curtail [the] duty to defend"). Further, because the Court finds that coverage was triggered by the claims premised on the problems allegedly created by the waterfowl, it need not address the claim based on the flooding of Schillaci and Newell's basement. <u>See, e.g.</u>, <u>Penny Preville, Inc.</u>, 1996 WL 389266, at *4 ("The insurer's duty to defend the entire action is triggered even if only one claim is potentially covered by the insurance policy.").

[for] . . . injury that the insured reasonably should have expected." Met P&C Mem. at 11. But courts construing similar policy exclusions have concluded that the analysis applicable to the question whether a loss was accidental is the same as that conducted in analyzing the effect of the exclusion. See, e.g., O'Connell v. State Farm Fire & Cas. Co., No. 03-CV-880, 2005 WL 1576793, at *4 (W.D.N.Y. July 1, 2005) ("Although the first disclaimer denies the existence of coverage in the first instance, while the second relies upon an [intentional act] exclusion [disclaiming coverage for injury expected or intended by the insured], the analysis is the same because the exclusion is 'nothing more than a restatement of the requirement that the harm be the result of an accident for there to be coverage.'" (quoting Jubin, 653 N.Y.S.2d at 455)), adopted by 2005 WL 2133600 (W.D.N.Y. Aug. 31, 2005); see also 1 M. Jane Goode, Law & Practice of Insurance Coverage Litigation § 6:20 (2017) ("Many liability policy forms contain exclusions for bodily injury 'which is expected or intended by the insured.' . . . Not surprisingly, the courts tend to use substantially the same approach in interpreting the exclusion as they have in interpreting the same or similar terms contained in the definition of occurrence. Indeed, it is sometimes impossible to determine whether a court has based its decision concerning coverage on the existence or nonexistence of an occurrence or on application of an intentional injury exclusion." (footnotes omitted)).

Since the Court holds that the Schillaci Complaint alleged an occurrence under the Homeowners Policy, Met P&C cannot rely on the intentional act exclusion to disclaim coverage. See 670 Apartments Corp., 1996 WL 559942, at *5 n.3 (concluding that, because the underlying complaint alleged a covered occurrence even though the insured received warnings about

potential harms resulting from its conduct *before* commencement of the underlying lawsuit, the policy's intentional loss exclusion did not bar coverage).

Met P&C also claims that it need not provide coverage to the Sarrises under the PELP. Met P&C Mem. at 13. The PELP "provide[d] liability coverage in excess of the 'retained limit' for damages to others caused by an 'occurrence' and to which the policy applies." PELP at 6. And it defined "occurrence" as "an accident, including continuous or repeated exposure to the same condition that results during the policy period in personal injury or property damage." Id. Since the Court holds that the identical provisions in the Homeowners Policy provide coverage for the Schillaci action, the PELP also provide coverage unless an exclusion applies.

The PELP contained an exclusion for "personal injury or property damage" caused by "any intentional act committed by an insured or at the direction of any insured." Id. at 7. Met P&C argues that this exclusion is so broad that "even if the resulting injury was unexpected, coverage is barred." Met P&C at 13. It cites no authority to support this interpretation, and at least one New York court has analyzed an identical exclusion using the same framework applicable to determining whether an occurrence has taken place. See N.Y. Cent. Mut. Fire Ins. Co. v. Wood, 827 N.Y.2d 760, 761–62 (App. Div. 2007) ("[A] possible basis exists upon which to find that [the insured] did not intend the resultant harm and, thus, Supreme Court properly found the intentional act exclusion inapplicable as a matter of law . . . ."). Once again, since the Court determines that the Schillaci Complaint alleged an occurrence triggering Met P&C's duty to defend, it also finds that the PELP's intentional act exclusion does not preclude coverage.[10]

---

[10]  Because the Court concludes that the intentional act exclusions in the Homeowners Policy and the PELP do not bar coverage, it need not address Met P&C's argument that its disclaimer of coverage premised on those exclusions applies to Joy Sarris. Met P&C Mem.

### B.  Notice

Although the Court holds that the Schillaci Complaint triggered Met P&C's duty to

defend, that does not end the inquiry. "Under New York law, . . . timely notice is a condition

precedent to coverage." Same Day Delivery Serv., Inc. v. Penn Star Ins. Co., 151 F. Supp. 3d

380, 385 (S.D.N.Y. 2015). "If an insured fails to provide timely notice as required by the

particular policy, then, absent a valid reason for the delay, the insurer is under no obligation to

defend or indemnify the insured." Am. Ins. Co. v. Fairchild Indus., Inc., 56 F.3d 435, 438 (2d

Cir. 1995). "[W]here an insurance policy requires that a notice of an incident be given promptly,

notice must be given within a reasonable period of time given the facts and circumstances of the

case." Seemann v. Sterling Ins. Co., 650 N.Y.S.2d 873, 874 (App. Div. 1996). The same standard

applies to policies that "require[] that notice of an occurrence be given 'as soon as practicable.'"

Great Canal Realty Corp. v. Seneca Ins. Co., 833 N.E.2d 1196, 1197 (N.Y. 2005). "The test for

determining whether [a] notice provision has been triggered is whether the circumstances known

to the insured at that time would have suggested to a reasonable person the possibility of a

claim." Abner, Herman & Brock, Inc. v. Great N. Ins. Co., 308 F. Supp. 2d 331, 337 (S.D.N.Y.

2004) (quoting Commercial Union Ins. Co. v. Int'l Flavors & Fragrances, Inc., 822 F.2d 267, 272

(2d Cir. 1987)). "[T]he question whether notice was given within a reasonable time may be

determined as a matter of law when (1) the facts bearing on the delay in providing notice are not

in dispute, and (2) the insured has not offered a legally valid excuse for the delay." Prof'l Prod.

Research Inc. v. Gen. Star Indem. Co., 623 F. Supp. 2d 438, 445 (S.D.N.Y. 2008). "Moreover,

'[w]here there is no excuse or mitigating factor, relatively short time periods of delay are deemed

_____

at 19–21.

26

unreasonable as a matter of law.'" Mt. Hawley Ins. Co. v. Abraham Little Neck Dev. Grp., Inc.,

825 F. Supp. 2d 384, 390 (E.D.N.Y. 2011) (quoting Cambridge Realty Co. v. St. Paul Fire &

Marine Ins. Co., 421 F. App'x 52, 57 (2d Cir. 2011)).[11]

  The Sarrises and Met P&C offer conflicting accounts of when Met P&C received notice

of the Schillaci action. According to Met P&C, the Sarrises did not provide notice until

December 2014, almost ten years after the litigation began. Met P&C Mem. at 15. The Sarrises,

on the other hand, argue that George provided notice of the Schillaci case "within days of its

service upon the Sarris defendants" by providing a copy of the Schillaci Complaint and summons

to Vince DeMidio, his MetLife agent. Joy Sarris Mem. at 3, 6. These conflicting stories create a

genuine dispute of material fact that cannot be resolved via summary judgment.

  Under the Sarrises' Homeowners Policy, Met P&C did not have to provide coverage for

an occurrence unless the Sarrises "[p]romptly notif[ied] [Met P&C] or [its] representative, in

writing, stating: 1. [the policyholder's] name and policy number; 2. the date, place and

circumstances of the accident; 3. the name and address of anyone who might have a claim against

[the policyholder]; and 4. the names and addresses of any witnesses." Homeowners Policy at 34.

The PELP required the Sarrises to "notify [Met P&C] or any authorized agent as soon as

---

  [11] "In 2008, the New York legislature amended New York Insurance Law to require the insurer, in cases in which notice is given to the insurer within two years of the occurrence, to show that it was prejudiced by the untimely notice." Atl. Cas. Ins. Co. v. Value Waterproofing, Inc., 918 F. Supp. 2d 243, 254 n.3 (S.D.N.Y. 2013), aff'd sub nom. Atl. Cas. Ins. Co. v. Greenwich Ins. Co., 548 F. App'x 716 (2d Cir. 2013). But "[t]he amendment to the New York Insurance Law applies to insurance policies that were issued or delivered after January 17, 2009," id., and since the policies at issue in this case were issued before then, Met P&C need not show prejudice, see Mt. Hawley Ins. Co., 825 F. Supp. 2d at 395 ("[B]ecause the Policy was issued on June 7, 2008, prior to Insurance Law § 3420(a)(5) taking effect on January 17, 2009, the Plaintiff is not required to show that it was prejudiced by Abraham Little Neck's untimely notice.").

practicable of an occurrence that may be covered by th[e] policy." PELP at 8. George Sarris says

that, within days of being served with the Schillaci Complaint and summons, he went to

DeMidio, told him about the lawsuit, and presented him with a copy of the summons and

complaint. George Sarris Decl. ¶¶ 58–59. Met P&C has admitted that DeMidio "was an agent of

[Met P&C]" from "2002 through February 2011." Dkt. No. 76-22 ("Met P&C Admissions") ¶ 1.

A reasonable jury could conclude from these facts that the Sarrises fulfilled their obligation under

the Homeowners Policy and the PELP to provide timely notice to Met P&C of the Schillaci

action. See, e.g., Gov't Emps. Ins. Co. v. Blecker, 541 N.Y.S.2d 39, 39 (App. Div. 1989)

(describing the sending of "a copy of a summons and complaint" in the underlying action to the

insurer as "written notice of the occurrence").[12]

      Met P&C sees it differently. It argues that the Sarrises have failed to create a genuine

dispute of fact as to whether it received timely notice because they "offer nothing other than

George Sarris's own testimony which has been directly contradicted by the testimony of Met

P&C and two-nonparty witnesses." Met P&C Resp. at 13. And, according to Met P&C, George

Sarris made contradictory statements about whether he had contacted MetLife's legal

department. Id. at 14. Met P&C appears to rely here on Jeffreys v. City of New York, 426 F.3d

549 (2d Cir. 2005), in which the Second Circuit created "a narrow exception to the general rule

---

    [12] The Sarrises do not make clear that they complied with each requirement of the notice provision in the Homeowners Policy. For example, the policy required the Sarrises to provide in writing "the names and addresses of any witnesses," Homeowners Policy at 34, and the Sarrises do not specify that they provided such information in writing after receiving service of the Schillaci Complaint and summons. But Met P&C does not argue that George Sarris's notice was improper for this reason, so the Court need not address this issue. See Perry ex rel. Perry v. Frederick Inv. Corp., 509 F. Supp. 2d 11, 15 n.5 (D.D.C. 2007) ("As the defendants do not make this argument in the pending summary judgment motion, . . . the Court will not consider it at this time.").

that assessments of credibility are the province of the jury," Vazquez v. City of New York,

No. 10-CV-6277, 2014 WL 4388497, at *6 (S.D.N.Y. Sept. 5, 2014). But this case does not fit

the Jeffreys exception.

Jeffreys held that in the "rare circumstance where the [non-moving party] relies almost

exclusively on his own testimony, much of which is contradictory and incomplete," a district

court may weigh the credibility of his version of events in determining whether to grant summary

judgment. 426 F.3d at 554. If the non-moving party's account is so contradictory and incomplete

that no reasonable juror would credit it, and if the "moving party . . . meet[s] the difficult burden

of demonstrating that there is no evidence in the record upon which a reasonable factfinder could

base a verdict in the [non-moving party's] favor," then the court may enter summary judgment in

favor of the moving party. Id. at 554–55. As the Second Circuit later noted, "[t]he facts in

Jeffreys . . . were extreme." Matheson v. Kitchen, 515 F. App'x 21, 23 (2d Cir. 2013). One of the

factual issues in dispute in Jeffreys was whether the plaintiff, in an attempt to evade capture by

the police, had jumped out of the third-floor window of a school building he was burgling, or

whether the police had pushed him out of the window. 426 F.3d at 551–52. The court

emphasized that "[t]he record confirms, and [the plaintiff] does not dispute, that on at least three

occasions he confessed to having jumped out of the third-story window of the school building."

Id. at 552. Indeed, the plaintiff "first publicly stated that he had been thrown out of a window by

police officers in a conversation with Dr. Charles Bendheim of the Greenhaven Correctional

Facility nine months after the incident allegedly occurred." Id.

George Sarris's testimony does not come close to the level of implausibility on display in

Jeffreys. The key testimony offered by George is that within days of receiving service of the

Schillaci lawsuit, he went to DeMidio, told him about the case, and gave him a copy of the

summons and complaint. George Sarris Decl. ¶¶ 58–59. Met P&C has not pointed to any

evidence in the record suggesting that George has made statements inconsistent with this story.

At best, it has offered "minor inconsistencies" that are not "irreconcilable to the point of deeming

[George] to be incredible as a matter of law." Laster v. Mancini, No. 07-CV-8265, 2013 WL

5405468, at *27 (S.D.N.Y. Sept. 25, 2013). And unlike the plaintiff in Jeffreys, George has not

"offered, for the first time in litigation, a version of events that directly contradicted the account

he had previously and consistently provided, and that was inconsistent with all other evidence in

the record." Matheson, 515 F. App'x at 23. This is simply not one of those "extraordinary cases"

in which a court may disregard a party's testimony on the ground of its implausibility. Rojas v.

Roman Catholic Diocese of Rochester, 660 F.3d 98, 106 (2d Cir. 2011). Accordingly, a

reasonable jury could believe George's version of events and conclude that timely notice was

provided to Met P&C.

But a reasonable jury could also find that Met P&C did not receive notice until December

23, 2014, almost ten years after the Schillaci action began. Burnep Aff. ¶¶ 8–9. Such a delay

would, needless to say, be unreasonable as a matter of law. See, e.g., Same Day Delivery Serv.,

Inc., 151 F. Supp. 3d at 386 ("New York courts have routinely held that when an insurance

policy requires notice to be provided as soon as practicable, delays of as little as one to four

months were not within a reasonable period of time as a matter of law." (collecting cases)); Eagle

Ins. Co. v. Zuckerman, 753 N.Y.S.2d 128, 129 (App. Div. 2003) (finding that an eighteen-month

delay in providing notice was unreasonable as a matter of law where the policy at issue required

"prompt" notice).

First, DeMidio himself testified that he had no recollection of George Sarris ever providing him with a copy of the summons and complaint in the Schillaci case. DeMidio Dep. at 35:4–11. True, "[n]o issue of fact exists where . . . one witness has a recollection of an event, while another actor in the same event has no recollection, 'one way or the other.'" Creighton v. City of New York, No. 12-CV-7454, 2017 WL 636415, at *40 (S.D.N.Y. Feb. 14, 2017) (collecting cases); see also Faruki v. City of New York, No. 10-CV-9614, 2012 WL 1085533, at *5 (S.D.N.Y. Mar. 30, 2012) ("Plaintiff's statement that she did not recall whether Defendants asked her to leave the store is insufficient to create a genuine dispute on that material issue."), aff'd, 517 F. App'x 1 (2d Cir. 2013). Yet DeMidio's understandable lapse of memory—over ten years passed between the alleged events in question and DeMidio's deposition—is not the only evidence Met P&C offers to establish that it did not receive notice until December 2014. For example, according to MetLife associate general counsel Charles Cavas, a February 2015 search of a database in MetLife's legal system for "any files or records concerning George Sarris and Joy Sarris" came up empty. Cavas Aff. ¶¶ 8–10. Cavas says that when the legal department "receives any requests for legal advice, inquiries into any substantial issues, or notices of significant litigation, a file is set up in [the database]." Id. ¶ 7. Given the lack of any records related to the Sarrises in the legal department's database, a reasonable jury might be hard pressed to believe that the Sarrises actually provided notice before December 2014, when George called the "MetLife 1-800 claim reporting number" and Joy sent the Schillaci Complaint and summons. Burnep Aff. ¶¶ 10–11.

Next, DeMidio testified that he typically told customers they "ha[d] to call claims to make [a] claim, because I only represent the company. I don't represent claims." DeMidio Dep.

at 76:19–77:3. And while George now says this correspondence reflected a misunderstanding, George Sarris Decl. ¶ 147, he and his wife sent a letter to Burnep in January 2015 stating that he had in fact spoken to the legal department about his case, Dkt. No. 65-27 ("January 1, 2015 Letter). But, as the Court just noted, in February 2015 the legal department could not find any "file or record evidencing any inquiries made by George or Joy Sarris." Cavas Aff. ¶ 10. A reasonable jury confronted with this evidence would be entitled to conclude that DeMidio told George to call the claims department and that, for whatever reason, he failed to do so until December 2014. Since the Court cannot resolve these conflicting narratives without making factual findings, a genuine dispute of fact exists as to whether Met P&C received timely notice of the Schillaci action, a condition precedent to coverage under the policies. Accordingly, the Court is currently not in a position to issue a declaration that Met P&C must defend the Sarrises in the Schillaci lawsuit.

## C.  Duty to Indemnify

While "the duty to defend is triggered by the filing of a lawsuit[, . . .] the duty to indemnify is triggered by a determination of liability." <u>Value Waterproofing, Inc.</u>, 918 F. Supp. 2d at 261. Thus, a declaratory judgment action initiated to determine whether an insurer must provide indemnification "is premature where . . . 'the complaint in the underlying action alleges several grounds of liability, some of which invoke the coverage of the policy, and where the issues of indemnification and coverage hinge on facts which will necessarily be decided in that underlying action.'" <u>Scottsdale Ins. Co. v. United Indus. & Constr. Corp.</u>, 137 F. Supp. 3d 167, 179 (E.D.N.Y. 2015) (quoting <u>Specialty Nat'l Ins. Co. v. English Bros. Funeral Home</u>, 606 F. Supp. 2d 466, 472 (S.D.N.Y. 2009)). In accordance with this principle, "[c]ourts considering

whether an insurer has a duty to indemnify on actions for declaratory relief generally decline to rule on the issue of indemnity until liability is determined in the underlying personal injury action." Town Plaza of Poughquag, LLC v. Hartford Ins. Co., 175 F. Supp. 3d 93, 100 (S.D.N.Y. 2016); see also Bovis Lend Lease LMB, Inc. v. Cont'l Cas. Ins. Co., No. 02-CV-7674, 2004 WL 691395, at *4 (S.D.N.Y. Mar. 31, 2004) ("A determination of Continental's duty to indemnify is premature because a resolution of the facts in the underlying action has not yet been made."); Park Place Entm't Corp. v. Transcon. Ins. Co., 225 F. Supp. 2d 406, 413 (S.D.N.Y. 2002) ("The President suit is still in progress, so any decision as to indemnity would clearly be premature at this juncture, as the actual basis of liability has yet to be determined.").

Met P&C "seeks on [sic] order of summary judgment declaring that Met P&C has no obligation to defend or indemnify" the Sarrises in the Schillaci case. Met P&C Mem. at 1. But as noted above, the Schillaci case appears to be ongoing. See George Sarris Decl. ¶ 86 ("Of utmost importance to me as a defendant is that the underlying Schillaci matter is still ongoing and unadjudicated."). Since Met P&C's duty to indemnify the Sarrises depends on a liability determination that has yet to be made, it would be premature for the Court to issue a declaration on this issue. Thus, the Court denies Met P&C's motion for summary judgment to the extent that it seeks such a declaration.

### D.  The Sarrises' Counterclaims

Met P&C moves for judgment on the pleadings with respect to the Sarrises' counterclaims alleging various violations of New York law. Met P&C Mem. at 22–25. The Sarrises brought counterclaims for violations of New York Insurance Law section 2601 and part 216 of the New York insurance regulations. Joy Sarris Answer ¶¶ 140–43; George Sarris Answer

33

¶¶ 137–40. These counterclaims cannot stand because "[i]t is well settled that no private cause of action exists for a violation of Insurance Law § 2601 or for an alleged violation of part 216 of the Insurance Regulations." De Marinis v. Tower Ins. Co. of N.Y., 774 N.Y.S.2d 436, 437 (App. Div. 2004) (collecting cases); accord, e.g., Harner v. Allstate Ins. Co., No. 11-CV-2933, 2012 WL 12326459, at *7 (S.D.N.Y. Sept. 7, 2012).

Joy Sarris also brought a counterclaim for violations of New York General Business Law section 349. Joy Sarris Answer ¶¶ 135–39. That counterclaim is deficient as well, because "a party must plead 'consumer-oriented' conduct in order to claim the benefit of Section 349," WorldHomeCenter.com, Inc. v. PLC Lighting, Inc., 851 F. Supp. 2d 494, 498 (S.D.N.Y. 2011), and Joy has utterly failed to do that.

"Consumer-oriented conduct is 'conduct that potentially affects similarly situated consumers.'" Arroyo v. PHH Mortg. Corp., No. 13-CV-2335, 2014 WL 2048384, at *10 (E.D.N.Y. May 19, 2014) (quoting Kapsis v. Am. Home Mortg. Servicing Inc., 923 F. Supp. 2d 430, 449 (E.D.N.Y. 2013)). Private contract disputes that are unique to the parties "[do] not fall within the ambit of [Section 349]." Id. (alterations in original) (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 647 N.E.2d 741, 744 (N.Y. 1995)). The problem for Joy is that she "has alleged only that [Met P&C] breached its obligations to her; she has not alleged that anyone other than she [or George] has suffered injury or potential injury as a result of [Met P&C's] conduct." Abraham v. Penn Mut. Life Ins. Co., No. 98-CV-6439, 2000 WL 1051848, at *3 (S.D.N.Y. July 31, 2000). This case is "essentially a 'private' contract dispute over policy coverage and the processing of a claim which is unique to these parties, not conduct which affects the consuming public at large." N.Y. Univ. v. Cont'l Ins. Co., 662 N.E.2d

763, 771 (N.Y. 1995). Indeed, Joy appears to suggest that the factual foundation for this claim is

that Met P&C has "impaired" "the Sarrises['] ability to negotiate a favorable settlement and/or

obtain a favorable judgment in the action by Schillaci and Newell." Joy Sarris Answer ¶ 139.

Thus, there is no basis for her counterclaim premised on New York General Business Law

section 349.

### E.  Improperly Raised Arguments

To the extent that Met P&C seeks dismissal of George Sarris's counterclaim for breach of

the duty of good faith and fair dealing, Met P&C Mem. at 25, the Court need not address that

argument because it is completely undeveloped, see Herbert v. Architect of Capitol, 839 F. Supp.

2d 284, 298 (D.D.C. 2012) ("[T]he [defendant] has simply failed to support its argument with

any meaningful measure of factual or legal argument. Courts need not consider cursory

arguments of this kind, and the Court declines to do so here."). Equally perfunctory are the

Sarrises' requests that the Court, among other things, dismiss Met P&C's Complaint on statute-

of-limitations grounds, find that Met P&C breached the duty of good faith and fair dealing, and

"[s]ustain" George Sarris's objections to various exhibits filed by Met P&C. Joy Sarris Mem.

at 23–24. Again, the Court will not address arguments raised without any attempt at providing

legal or factual support. Finally, in his reply brief, George Sarris asks the Court to grant summary

judgment on his claim for breach of the duty of good faith and fair dealing. George Sarris Reply

at 8. But it is well established that "a district court is free to disregard argument[s] raised for the

first time in reply papers, especially on a motion for summary judgment." Am. Hotel Int'l Grp.,

Inc. v. OneBeacon Ins. Co., 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009). Thus, the Court need not

address this belatedly raised argument.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Met P&C's motion for summary judgment and judgment on the pleadings (Dkt. No. 65) is **GRANTED in part** as to the dismissal of the Sarrises' counterclaims alleging violations of New York General Business Law section 348, New York Insurance Law section 2601, and New York insurance regulations, **and DENIED in all other respects**; and it is further

**ORDERED**, that the Sarrises' cross-motions for summary judgment (Dkt. Nos. 74, 78) are **GRANTED in part** as to the Schillaci action's triggering Met P&C's duty to defend, **and DENIED in all other respects**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        July 28, 2017
              Albany, New York


Lawrence E. Kahn
U.S. District Judge

36